UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

─────────────────────────────────────

JONATHAN ODOM,

|  |  | **DECISION** |
|---|---|---|
|  | Plaintiff, | **and** |
| v. |  | **ORDER** |

THOMAS DIXION,                                              **04-CV-889F**
DON LOPES,                                                        **(consent)**
JEFF SEKUTERSKI,
C. JABCUGA,
C. PETTIES,
SGT. MARKOWSKI, and
JOHN DOE,

                                        Defendants.

─────────────────────────────────────

APPEARANCES:          JONATHAN ODOM, *Pro Se*
                                  92-T-0387
                                  Auburn Correctional Services
                                  Box 618
                                  Auburn, New York 13024

                                  ANDREW M. CUOMO
                                  Attorney General, State of New York
                                  Attorney for Defendants
                                  KIM S. MURPHY
                                  Assistant Attorney General, of Counsel
                                  107 Statler Towers
                                  Fourth Floor
                                  Buffalo, New York  14202

### JURISDICTION

On October 24, 2005, the parties to this action consented to proceed before the

undersigned.  The matter is presently before the court on Defendants' motion for

summary judgment (Doc. No. 47), filed December 14, 2006.

## BACKGROUND and FACTS[1]

Plaintiff Jonathan Odom ("Plaintiff") commenced this civil rights action on November 8, 2004, pursuant to 42 U.S.C. §§ 1983 and 1985, alleging Defendants, employees of the New York State Department of Corrections ("DOCS"), at Attica Correctional Facility ("Attica"), where Plaintiff was then incarcerated, violated his constitutional rights by denying him properly prepared kosher meals in accordance with Plaintiff's religious beliefs, and by harassing and retaliating against Plaintiff when he filed grievances regarding the alleged denial of such meals.  The Complaint names as Defendants Lieutenant Thomas Dixon[2] ("Lt. Dixon"), Attica Food Services Administrator II Donald Lopes ("Lopes"), Correction Officer ("C.O.") Christopher Jabcuga ("Jabcuga"), Sergeant S. Markowski ("Sgt. Markowski"), C.O. Corey Petties ("Petties"), Sergeant Jeff Sekuterski ("Sgt. Sekuterski"), and John Doe ("Doe").  Plaintiff specifically alleges as his First Cause of Action a denial of the right to freely exercise his religion in violation of the First Amendment and the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq*., and a denial of equal protection in violation of the Fourteenth Amendment, and, as his Second Cause of Action, retaliation for filing grievances in violation of the First Amendment, and an Eighth Amendment excessive force claim.

The gravamen of Plaintiff's religious freedom and equal protection claims concerns his kosher diet, referred to as the "cold alternative diet" or "CAD."  On September 1, 2004, Plaintiff filed Inmate Grievances Nos. 47427-04 and 47428-04 ("the

---

[1] The Facts are taken from the pleadings and motion papers filed in this action.

[2] Incorrectly spelled as "Dixon" in the Complaint's caption and allegations.

Grievances"), complaining about the manner in which the CAD meals were provided to Plaintiff.  According to Plaintiff, Defendants failed to provide Plaintiff with the proper utensils to open hermetically sealed kosher food packs, or with hot water for his instant oatmeal and coffee, permitted a non-Jewish inmate to prepare Plaintiff's kosher food, in violation of the dietary rules of the Jewish religion ("the kashrut"), deprived Plaintiff of a proper meal with which to break his fast during Yom Kippur on September 25, 2004, failed to provide Plaintiff with kosher meals while in keeplock on October 1, 6, 7, 10 and 11, 2004, and refused to permit Plaintiff to take certain food items from the assigned mess hall to Plaintiff's cell.  Complaint, First Cause of Action. As for the retaliation and excessive force claims, Plaintiff alleges that Defendants retaliated against Plaintiff for filing the Grievances regarding the alleged kosher food plan violations, including the denial of kosher meals, threatening Plaintiff with bodily harm if he continued to pursue his grievances, and, on October 15, 2004, flooding Plaintiff's cell with water, and physically assaulting Plaintiff, causing Plaintiff to sustain injuries.  Complaint, Second Cause of Action.

In support of Plaintiff's allegation that he has exhausted all available administrative remedies relative to his claims as required under the Prison Litigation Reform Act of 1986 ("the PLRA"), 110 Stat. 1321 (1996), codified at 42 U.S.C. § 1997e, Plaintiff attaches to the Complaint a copy of a letter from DOCS Inmate Grievance Program Director Thomas G. Eagen, dated October 12, 2004, acknowledging receipt of Plaintiff's correspondence dated September 29, 2004, pertaining to two inmate grievances, specifically, Grievances Nos. 47427/04 and 47428/04 ("the grievances"), raising the issues alleged in this action, and advising that Plaintiff's concerns asserted in

the grievances had already been addressed by the Inmate Grievance Program Supervisor on September 30, 2004.

In a Decision and Order filed May 24, 2005 (Doc. No. 13) ("May 24, 2005 Decision and Order"), District Judge Charles J. Siragusa, *sua sponte*, converted Plaintiff's RFRA claim to a claim under the Religious Land Use and Institutionalized Persons Act of 2000 ("the RLUIPA"), 42 U.S.C. § 2000cc-1, and permitted the First Cause of Action asserting Plaintiff's claims under the RLUIPA, and the First and Fourteenth Amendments, to proceed only against Defendants Dixon, Lopes and Jabcuga, dismissed such claim as against the other Defendants, thereby dismissing the First Amendment and RLUIPA religious claims and the Fourteenth Amendment equal protection claim against Defendants Sekuterski, Petties, Markowski and Doe.  May 24, 2005 Decision and Order at 5-8.  Judge Siragusa, also *sua sponte*, permitted Plaintiff's Second Cause of Action alleging First Amendment retaliation and Eight Amendment excessive force claims to proceed only against Defendants Dixon, Markowski and Petties, and dismissed such claims as to the remaining named Defendants, *i.e.*, Lopes and Jabcuga.  *Id*. at 8-11.  Finally, Judge Siragusa dismissed Plaintiff's § 1985 conspiracy claim as against all Defendants for failing to allege with any specificity that any "meeting of the minds" occurred as required for a conspiracy under § 1985.  *Id*. at 12-13.

On December 14, 2006, Defendants filed the instant motion for summary judgment (Doc. No. 47) ("Defendants' motion"), along with a Memorandum of Law (Doc. No. 48) ("Defendants' Memorandum"), a Statement of Undisputed Facts (Doc. No. 49) ("Defendants' Statement of Facts"), and the Declarations of Lt. Dixon (Doc. No. 50)

("Dixon Declaration") with attached exhibits A through P ("Dixon Declaration Exh(s).

__"), Attica Registered Nurse Vance Hawley (Doc. No. 51) ("Hawley Declaration"),

Jabcuga (Doc. No. 52) ("Jabcuga Declaration"), Lopes (Doc. No. 53) ("Lopes

Declaration"), Markowski (Doc. No. 54) ("Markowski Declaration"), Rabbi Arthur

Morgenstern ("Rabbi Morgenstern") (Doc. No. 55) ("Rabbi Morgenstern Declaration"),

and Petties (Doc No. 56) ("Petties Declaration").

In light of Plaintiff's *pro se* status, on December 29, 2006, a notice to Plaintiff

pursuant to Local Rule of Civil Procedures 56.2 and *Irby v. New York City Transit*

*Authority*, 262 F.3d 412, 413 (2d Cir. 2001) (Doc. No. 58) ("IRBY notice"), was mailed to

Plaintiff, advising Plaintiff that Defendants had moved the court to decide Plaintiff's

claims against Plaintiff, without a trial and based only on written materials submitted in

support of Defendant's motion.  The IRBY notice further advised Plaintiff that to avoid

summary judgment being granted in Defendants' favor, it was necessary to file papers,

including sworn affidavits, establishing the existence of a material issue of fact, and that

any material issue of undisputed fact set forth in Defendants' Statement of Facts would

be deemed admitted if not controverted by Plaintiff.

An Order filed January 3, 2007 (Doc. No. 59), established February 16, 2007, as

Plaintiff's deadline for filing a response opposing Defendants' motion, and March 2,

2007 as Defendants' deadline for filing any reply in further support of the motion.

Plaintiff did not timely respond in opposition to summary judgment and, on March 1,

2007, Defendants filed the Declaration of Assistant Attorney General Kim S. Murphy

("Murphy") (Doc. No. 60) ("Murphy Declaration"), requesting summary judgment be

granted in Defendants' favor and the case be dismissed.  By letter filed March 8, 2007

(Doc. No. 61) ("March 8, 2007 letter"), Plaintiff advised that during a recent transfer between prison facilities, his legal materials and papers were destroyed such that Plaintiff was unable to further litigate the instant action, and requested the action be terminated.  Accordingly, on March 9, 2007, the undersigned entered an order (Doc. No. 62) ("the Dismissal Order"), granting Plaintiff's request and directing the file be closed.

On March 19, 2007, Plaintiff filed a motion (Doc. No. 63), to vacate the Dismissal Order, explaining that the March 8, 2007 letter was intended only to advise the court of Plaintiff's inability to timely respond in opposition to Defendants' motion, rather than to request the action be terminated.  Defendants' response in opposition to the motion was filed on April 3, 2007, and, on April 13, 2007, Plaintiff filed a reply in further support of the motion to vacate.  By Order filed March 23, 2007 (Doc. No. 69), the undersigned granted Plaintiff's motion to vacate the Dismissal Order, and set July 31, 2007 as the deadline for Plaintiff to file a response in opposition to summary judgment, and August 31, 2007 as Defendants' deadline to file any reply.

On August 20, 2007, Plaintiff filed in opposition to summary judgment a Declaration (Doc. No. 73) ("Plaintiff's Declaration"), with attached exhibits A through M ("Plaintiff's Exh(s). __"), a Brief in Opposition to Defendants' Summary Judgment Motion (Doc. No. 74) ("Plaintiff's Memorandum"), a Statement of Disputed Factual Issues (Doc. No. 75) ("Plaintiff's Statement of Facts"), and the Declaration of Marquis Brooks (Doc. No. 76) ("Brooks Declaration").

In further support of summary judgment, Defendants filed on September 18, 2007, the Reply Declaration of Assistant Attorney General Kim S. Murphy (Doc. No. 78) ("Murphy Reply Declaration").  On October 17, 2007, Plaintiff filed a Supplemental

Declaration in Support of Plaintiff's Opposition to Defendants' Motion for Summary

Judgment (Doc. No. 79) ("Plaintiff's Surreply Declaration"), with attached exhibit A

("Plaintiff's Surreply Exh. A").  Oral argument was deemed unnecessary.

Based on the following, Defendants' motion is GRANTED in part and DENIED in

part.


## DISCUSSION

**1.     Summary Judgment**

Summary judgment of a claim or defense will be granted when a moving party

demonstrates that there are no genuine issues as to any material fact and that a moving

party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 250-51 (1986); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991).  The court is

required to construe the evidence in the light most favorable to the non-moving party.

*Tenenbaum v. Williams*, 193 F.3d 58, 59 (2d Cir. 1999) (citing *Anderson, supra*, 477

U.S. at 255); *Rattner*, *supra*.  The party moving for summary judgment bears the burden

of establishing the nonexistence of any genuine issue of material fact and if there is any

evidence in the record based upon any source from which a reasonable inference in the

non-moving party's favor may be drawn, a moving party cannot obtain a summary

judgment.  *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary

judgment will not lie if the dispute about a material fact is "genuine," that is, if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party").

"[W]here the nonmoving party will bear the burden of proof at trial on a

dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule [FRCP 56],' and Rule 56(e) therefore requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex, supra*, 477 U.S. at 323-24 (1986) (quoting Fed. R. Civ. P. 56).  Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the non-moving party's case."  *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 164 F.3d 736, 742 (2d Cir. 1998).  Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995). "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial."  *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).  Rule 56 further provides that

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed. R. Civ. P. 56(e).

Defendants are alleged to have violated Plaintiff's civil rights under 42 U.S.C. §

1983, pursuant to which an individual may seek damages against any person who, under color of state law, subjects such individual to the deprivation of any rights, privileges, or immunities protected by the Constitution or laws of the United States.  42 U.S.C. § 1983.  Section 1983, however, "'is not itself a source of a substantive rights,' but merely provides 'a method for vindication of federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)).  Thus, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed."  *Id.*  (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989); and *Baker*, 443 U.S. at 140).  Here, Plaintiff alleges as his First Cause of Action violations of his right to religious freedom under the First Amendment, as determined by the court, and the RLUIPA, and a Fourteenth Amendment equal protection violation, and, as his Second Cause of Action, an Eighth Amendment excessive force claim, and a First Amendment retaliation claim.  As discussed *infra*, summary judgment is GRANTED as to the claims asserted under the First Cause of Action, but GRANTED in part and DENIED in part as to the claims asserted under the Second Cause of Action.

**2.     Religious Freedom**

Plaintiff's religious liberty claim is asserted under both the First Amendment's Free Exercise Clause and § 3 of the RLUIPA.  Preliminarily, the court observes that whether asserted under the First Amendment or the RLUIPA, a religious liberty claim requires the prisoner demonstrate "that the disputed conduct substantially burdens his *sincerely held religious beliefs*."  *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir.

2006 (italics added) (citing RLUIPA, 42 U.S.C. § 2000cc-1(a), and *Ford v. McGinnis*, 352 F.3d 582, 587 (2d Cir. 2003) (First Amendment Free Exercise Clause)).[3]

As relevant, § 3 of the RLUIPA provides that the government shall not "impose a substantial burden" on the "religious exercise" of inmates in certain institutions unless the government demonstrates that the burden furthers a compelling governmental interest by the least restrictive means.  42 U.S.C. § 2000cc-1(a); *see Salahuddin*, 467 F.3d at 273.  "Religious exercise" is defined under the RLUIPA to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A).  "Section 3 applies if 'the substantial burden [on religious exercise] is imposed in a program or activity that received Federal financial assistance.'" *Salahuddin*, 467 F.3d at 273 n. 2 (quoting 42 U.S.C. § 2000cc-1(b)(1).  "In the prison context, this section sweeps broadly as '[e]very State . . . accepts federal funding for its prisons.'" *Id*. (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 716 n. 4 (2005)).

Analyzing Plaintiff's claim under the First Amendment, "[t]he Free Exercise Clause of the First Amendment is an 'unflinching pledge to allow our citizenry to explore . . . religious beliefs in accordance with the dictates of their conscience.'" *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999) (quoting *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984)).  Because prisoners retain their right to religious freedom even when incarcerated, inmates are entitled to reasonable accommodation of their religious

---

[3] Because the threshold inquiry of a religious freedom claim under both the First Amendment and the RLUIPA is the same, the court does not consider whether a violation of the RLUIPA, which provides for a separate cause of action, can serve as a basis for a § 1983 claim.  *See Salahuddin*, 467 F.3d at 273-75 (addressing inmate plaintiff's § 1983 religious liberty claim asserted under both First Amendment Free Exercise Clause and RLUIPA § 3, without discussing whether RLUIPA provides a basis for § 1983 action).

beliefs, consistent with needs of prisoner security, including "religious dietary beliefs, as 'prison officials must provide a prisoner a diet that is consistent with his religious scruples.'" *Jackson*, 196 F.3d at 320 (citing cases and quoting *Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir. 1992)).

Prisoners do not abandon their constitutional rights at the "jailhouse door," *Bell v. Wolfish*, 441 U.S. 520, 576 (1979) (Marshall, J., dissenting), although "'[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)).   As such, "a challenged prison regulation is judged 'under a 'reasonableness' test less restrictive than that ordinarily applied': a regulation that burdens a protected right passes constitutional muster 'if it is reasonably related to legitimate penological interests.'" *Salahuddin*, 467 F.3d at 274 (quoting *O'Lone*, 482 U.S. at 349 (additional internal quotation marks omitted)).

As stated, a religious liberty claim, whether asserted under the First Amendment or the RLUIPA, requires the prisoner demonstrate "that the disputed conduct substantially burdens his *sincerely held religious beliefs*." *Salahuddin*, 467 F.3d at 274-75 (italics added) (citing RLUIPA, 42 U.S.C. § 2000cc-1(a), and *Ford v. McGinnis*, 352 F.3d 582, 587 (2d Cir. 2003) (discussing requirements of First Amendment Free Exercise Clause)).   "The defendants [prison officials] then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct," to shift the burden back to the inmate to "show that these articulated concerns were irrational." *Salahuddin*, 467 F.3d at 275 (citing *Ford*, 352 F.3d at 595) (internal

quotations marks and brackets omitted) (bracketed material added).

### A.      Sincerity of Plaintiff's Religious Beliefs

As a threshold matter, Defendants argue that Plaintiff's alleged Jewish faith, including its kosher dietary requirements, is not a sincerely held belief, a threshold requirement for any religious freedom claim under either the First Amendment or the RLUIPA.  Defendants' Memorandum at 3-5.  According to Defendants, Plaintiff "did not practice any type of Judaism prior to his DOCS incarceration in 1992.  On August 5, 2004, just a few months prior to the complained of actions, plaintiff switched his religious designation from Muslim to Jewish."  Defendant's Memorandum at 4 (citing Dixon Declaration ¶ 4 and Exh. B).  Thus, Plaintiff, as far as the prison officials at Attica were concerned, was "Jewish" for less than one month prior to the date of the earliest allegations in the Complaint.  *Id.*  Defendants also maintain that because DOCS kosher diet is generally considered as better than the meals provided to non-Jewish inmates in the regular prison diet, inmates have been known to convert to Judaism, by submitting forms to change, administratively, their religious preference at the correctional facility, to receive the more palatable meals. *Id*. (citing Dixon Declaration ¶ 10).  Furthermore, Defendants urge the court to find that Plaintiff's religious beliefs are not sincerely held given that "[o]utside prison walls, it is very difficult for a civilian to convert to Judaism," in accordance with the requirements of Judaic law, and also in consideration of "plaintiff's extensive history of bringing frivolous lawsuits."  Defendants' Memorandum at 4-5 (citing Rabbi Morgenstern Declaration ¶ 2).  Plaintiff has not directly responded to this

argument.[4]

As discussed, Discussion, *supra*, at 10, the threshold determination to be made with regard to a religious liberty claim under either the First Amendment or the RLUIPA is whether the inmate plaintiff's religious beliefs are sincerely held.  *Salahuddin*, 467 F.3d at 274-75 (RLUIPA); and *Ford*, 352 F.3d at 587 (First Amendment Free Exercise Clause).  Whether an inmate's beliefs in the Jewish religion are sincerely held, however, is subjective and requires a determination of genuine issues of material fact. Specifically, in a similar case in which the plaintiff inmate alleged that the defendant prison officials' refusal to provide the inmate with a kosher diet violated the inmate's right to religious freedom, the Second Circuit held that summary judgment was precluded based on a genuine issue of material fact as to whether an inmate's beliefs in the Jewish religion were sincerely held, despite the prison's Jewish chaplain's statement that the inmate's alleged conversion to Judaism was not in accordance with Judaic law as required to be considered Jewish.  *Jackson*, 196 F.3d at 320-21.  Similarly, in the instant case, despite the timing of Plaintiff's "conversion" and Defendants' alleged interference with Plaintiff's kosher diet, the sincerity of Plaintiff's conversion to Judaism cannot be determined without weighing facts.  As such, this aspect of Defendants' motion does not warrant summary judgment.

**B.      Manner in which kosher meals are provided**

---

[4] Plaintiff neither challenges the accuracy of Rabbi Morgenstern's interpretation of Judaic law nor disputes Rabbi Morgenstern's explanation of any of the tenets of the Jewish faith.

Plaintiff's allegations, under both the First Amendment and RLUIPA, that Defendants failed to provide Plaintiff with the proper utensils to open hermetically sealed kosher food packs, Complaint ¶ 10, or with hot water for his instant oatmeal and coffee, *id.*, and permitted a non-Jewish inmate to prepare kosher food by opening cans of kosher tuna and sardines, and placing the contents into paper cups, Complaint ¶¶ 17-18, essentially challenge the manner in which Plaintiff's kosher meals are provided to him.  Defendants maintain that even assuming, *arguendo*, such allegations are true, they fail to establish that Defendants substantially burdened Plaintiff's exercise of a key tenet of his religion, citing statements made by Rabbi Morgenstern in support. Defendants' Memorandum at 5-12 (citing Rabbi Morgenstern Declaration ¶¶ 4-6).

As discussed, Discussion, *supra*, at 10, both the First Amendment and the RLUIPA require that the conduct of which the inmate plaintiff complains "substantially burdens" the inmate's "sincerely held religious beliefs." *Salahuddin*, 467 F.3d at 274-75 (RLUIPA), and *Ford*, 352 F.3d at 587 (First Amendment Free Exercise Clause)). Although the court is precluded on summary judgment from weighing facts so as to determine the sincerity of Plaintiff's religious beliefs, *Jackson*, 196 F.3d at 320, the court is permitted to determine whether, as a matter of law, Defendants' conduct challenged by Plaintiff "substantially burdens" Plaintiff's practice of his religion by interfering with or violating a key tenet of Judaism.  *Salahuddin*, 467 F.3d at 274-75; *Ford*, 352 F.3d at 587.

According to Rabbi Morgenstern, kashrut, the Jewish dietary law governing the preparation and consumption of kosher food, makes no provision regarding where a Jewish person is to consume kosher food, and the location of Plaintiff's kosher meals

"has no bearing whatsoever on [Plaintiff's] ability to practice Judaism."  Rabbi

Morgenstern Declaration ¶¶ 4-5.  Nor is there any requirement that kosher food be

prepared only by people of the Jewish faith, and not by a non-Jewish person.  *Id*. ¶ 6

("Having a non-Jewish or non-kosher person prepare or open kosher food does not

make the food unkosher.").  This includes the removal of lids from cans of tuna fish and

sardines before serving the contents to the inmates.  *Id*.  Defendants maintain, and

Plaintiff does not dispute, that because the lids have sharp metal edges that could be

used as weapons, the removal of the lids before serving the canned foods is a

legitimate penological reason, as recognized by the Supreme Court.  Defendants'

Memorandum at 8 (citing *O'Lone*, 482 U.S. at 353); Dixon Declaration ¶ 16.  Rabbi

Morgenstern further maintains that it would not offend the kashrut for an inmate who

keeps kosher to request a member of the correctional facility to open hermetically

sealed foods if the inmate is unable to do so with a plastic utensil.  *Id*.  Rabbi

Morgenstern does not, however, address Plaintiff's allegations regarding the lack of hot

water in the mess hall without which Plaintiff was unable to prepare his instant oatmeal,

sanka coffee or tea.

    In opposition to summary judgment, Plaintiff submits a copy of an article entitled

"Kashrut: Jewish Dietary Laws," ("the article") Plaintiff's Exh. A,[5] which Plaintiff

maintains establishes that the kashrut requires inmates to eat in a kosher dining hall,

and for kosher food to be prepared only by people of the Jewish faith.  Plaintiff's

Declaration ¶¶ 4-7.  A plain reading of the article, however, reveals no mention of any

---

[5] Defendants do not challenge the article as inadmissible hearsay.

requirement under the kashrut that meals are to be eaten in any particular place, or that only Jewish persons are able to prepare kosher food.

As for Plaintiff's allegations regarding the lack of hot water in the mess hall for preparation of the instant oatmeal packets, sanka coffee and tea, Defendants concede that although generally hot water for such use is made available in the mess hall, on occasion, no hot water is available in the mess halls.  Lopes Declaration ¶ 9. Defendants further maintain that even if hot water is not available, inmates are permitted to have in their cells hot pots for heating water for such purposes.  *Id*. Regardless of whether hot water is available for inmates to prepare instant oatmeal packets, sanka coffee or tea, Plaintiff points to nothing establishing that the consumption of such foods is required to maintain a kosher diet.  Nor does the article Plaintiff submits in opposition to summary judgment specifically require such foods be made available as part of a kosher diet.[6]  *See* Plaintiff's Exh. A, *passim*.  As such, Plaintiff has failed to establish that the denial of hot water for such purpose substantially burdens the exercise of his religion as required for a religious freedom claim under either the First Amendment Free Exercise Clause or the RLUIPA.

Furthermore, there is no merit to Plaintiff's contention that to the extent Plaintiff's interpretation of the kashrut differs from that endorsed by Rabbi Morgenstern, and not

---

[6] Notwithstanding the Supreme Court's instruction to liberally construe pleadings of *pro se* plaintiffs, *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (allegations of complaint drafted by *pro se* plaintiff held to less stringent standards than formal pleadings drafted by attorneys), the court declines to construe Plaintiff's allegations regarding the lack of hot water in the mess hall with which to prepare instant oatmeal packets, sanka coffee and tea, Complaint ¶¶ 10, 15, as alleging an Eighth Amendment violation based on prison conditions.  Specifically, despite Plaintiff's later assertions in papers opposing summary judgment regarding the poor quality of the food served for the kosher meals, Plaintiff's Memorandum at 8 and 12-15, as well as the Declaration of Marquis Brooks (Doc. No. 76), Plaintiff submits no evidence that he was unable to obtain nutritionally sound meals from the kosher diet or that he suffered any physical ailments as a result of the diet.  Nor has Plaintiff moved to amend the Complaint to allege such a claim.

challenged by Plaintiff, Plaintiff's interpretation is entitled to First Amendment protection, even if it is not consistent with a generally accepted tenet of Judaism, so long as the subject belief is sincerely held by Plaintiff.  Plaintiff's Memorandum at 9-12.  In support of this argument, Plaintiff references *Frazee v. Illinois Department of Employment Security*, 489 U.S. 829 (1989); *Jackson*, 196 F.3d 316, and *Patrick*, 745 F.2d 153.  *Id*. Each of these cases, however, is inapposite.

At issue in *Frazee*, *supra*, was whether the Illinois Department of Employment Security's determination that the plaintiff's refusal to work on Sunday, where such refusal was not based on the basic tenets of an established religious sect but, rather, on the plaintiff's own personal religious beliefs given that the plaintiff was not a member of any established church or religious sect, disqualified the plaintiff from receiving unemployment benefits.  In holding that the denial of unemployment benefits violated the First Amendment's Free Exercise Clause, the Court stated that *"[u]ndoubtedly, membership in an organized religious denomination, especially forbidding members to work on Sunday, would simplify the problem of identifying sincerely held religious beliefs*, but we reject the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization." *Frazee*, 489 U.S. at 834 (italics added). The Court thus implied that where, as here, the plaintiff asserts membership in an organized religious denomination, Judaism, the plaintiff must establish that the defendants' challenged conduct violates a fundamental tenet of the particular religion.

At issue in *Jackson*, *supra*, was the inmate's removal from the kosher diet program based on the statement of the correctional facility's rabbi that the inmate was

not Jewish according to specific criteria set forth under Judaic law, *i.e.*, that  "a Jew is

one who was born Jewish or has formally converted."  *Jackson*, 196 F.3d at 317-18

(internal quotation marks omitted).  In *Jackson*, the inmate plaintiff had, upon entering

the prison system in 1986, identified himself as being of the Jewish faith and

participated in the kosher diet program until the rabbi's determination in 1995 that

Plaintiff was not Jewish.  *Id*.  In finding that a genuine issue of fact precluded summary

judgment as to whether the inmate plaintiff's beliefs that he was Jewish were sincere,

the court stated that "[a] claimant need not be a member of a particular organized

religious denomination to show sincerity of belief."  *Id*. at 320 (citing *Frazee*, 489 U.S. at

834).  As such, the district court had erred in relying on the prison rabbi's statement that

the plaintiff was not Jewish.  *Id*.  In other words, at issue was not whether any particular

practice of the inmate plaintiff was in accordance with a sincerely held religious belief

but, rather, whether the inmate plaintiff sincerely believed he was of the Jewish faith, a

fact which could not be reached on summary judgment.  Further, in contrast to the

instant case, the plaintiff in *Jackson* was not claiming a violation of his religious liberty

based on his own personal interpretation of any the tenet of the Jewish religion.

With regard to *Patrick*, *supra*, there the inmate plaintiff alleged the defendant

prison officials interfered with the plaintiff's right to practice his religion by refusing to

recognize as a religious group "the Five Percenter Nation of Islam" and, consequently,

denying the plaintiff the right to gather with other inmates for worship purposes.  *Patrick*,

745 F.2d at 155.  Thus, the issue in *Patrick* was not whether the inmate plaintiff's

religious beliefs were sincerely held but, rather, whether the "religion" the inmate

practiced should be recognized as a religion, the practice of which would be entitled to

First Amendment protection.  Accordingly, none of these cases supports Plaintiff's assertion that, as a sincere adherent to Judaism, Plaintiff's individual interpretations of Judaism's dietary requirements must, under the First Amendment or the RLUIPA, be accepted.

Moreover, the sincerity of Plaintiff's interpretation of the kashrut as requiring him to eat in a kosher mess hall, and that the CAD meal be prepared only by people of the Jewish faith who keep kosher, is negated by Plaintiff's reliance on the article for the basis of such belief.  Simply put, support for Plaintiff's interpretation of the kashrut is not found anywhere in the article, and Plaintiff's claim thus is nothing more than a conclusory assertion insufficient to survive summary judgment.  Rule 56(e); *Kia v. McIntyre*, 235 F.3d 749, 763 (2d Cir. 2000) ("A plaintiff may not survive a properly asserted motion for summary judgment on the basis of conclusory allegations alone.").  Nor does Plaintiff dispute or challenge the validity or accuracy of Rabbi Morgenstern's interpretation of the kashrut.  Further, discovery in this action has concluded and Plaintiff does not contend that he has been prevented by Defendants from obtaining the requisite evidence necessary to support his claim.

As for Plaintiff's assertion that he was unable to open the hermetically sealed packets of meats with the plastic spoon provided, creating a further violation of his Kashrut beliefs, Complaint ¶10, Rabbi Morgenstern states that "[i]t would not offend kashrut for plaintiff to ask a member of the facility staff to open his hermetically sealed foods for him if he is not able to do so with a plastic spoon or fork."  Rabbi Morgenstern Declaration ¶ 6.  Plaintiff's conclusory assertion fails to meet his burden on summary judgment by pointing to any evidence contradicting Rabbi Morgenstern's statement.

19

Rule 56(e); *Kia*, 235 F.3d at 763.  Significantly, Plaintiff does not challenge Rabbi

Morgenstern's standing to make definitive and correct statement regarding the tenets

and Judaism, and its related kosher laws.

Finally, Plaintiff's later assertion in opposition to summary judgment that he was

provided with non-kosher utensils with which to consume his kosher meal, in violation of

the kashrut, Plaintiff's Memorandum at 13; Plaintiff's Declaration ¶ 2; Plaintiff's

Statement of Facts ¶ 8, a claim not found in the Complaint,[7] is inconsistent with

Plaintiff's allegation, Complaint ¶ 10, that only plastic spoons were provided, as well as

with Defendants' assertion that inmates are provided with plastic "sporks" which are not

reused and, as such, would never come into contact with any prohibited items.  Murphy

Reply Declaration ¶ 9.  Significantly, "factual issues created solely by an affidavit crafted

to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes*, 84

F.3d at 619.  This claim is therefore without merit.

Plaintiff has thus failed to point to any evidence establishing any genuine issue of

material fact that the manner in which the kosher meals are prepared and served

substantially burdens any sincerely held religious belief, constituting a major tenet of

Judaism, as required to establish a claim under either the First Amendment Free

Exercise Clause or the RLUIPA.  Summary judgment as to this aspect of Defendants'

motion is therefore GRANTED.

### C.    Location where meals are to be consumed

---

[7] Significantly, Plaintiff has not moved to amend the Complaint to add this claim.

Plaintiff's allegation that he is not permitted to take certain food items from the mess hall to his cell, including uncooked whole onions, green peppers, cucumbers, and packets of instant oatmeal, sanka coffee and tea, Complaint ¶¶ 9, 11, 15-16, challenges the location where Plaintiff is permitted to consume his kosher food.  In support of summary judgment, Defendants rely on Rabbi Morgenstern's statement that neither the location of Plaintiff's meals nor Plaintiff's ability to remove food from the mess hall to consume in his cell "has [any] bearing whatsoever on his ability to practice Judaism." Defendants' Memorandum at 7 (citing Morgenstern Declaration ¶ 4).  Significantly, Plaintiff points to nothing contradicting Rabbi Morgenstern's statement, nor does the article on which Plaintiff relies, Plaintiff's Exh. A, support this conclusory assertion so as to defeat summary judgment.  Rule 56(e); *Kia*, 235 F.3d at 763.

Summary judgment is GRANTED as to this claim.


**D.     Failure to provide kosher meals**

Plaintiff alleges that on September 25, 2004, Defendants Dixon and Lopes canceled Plaintiff's "call-out" to pick up trays of proper foods with which to break the Yom Kippur fast, Complaint ¶¶ 19-21, and that Defendant Lopes failed to provide Plaintiff with kosher meals for breakfast on October 1, 7 and 10, 2004, and dinner on October 6, 7, 10, and 11, 2004, during which time Plaintiff was in keeplock status. Complaint ¶ 22.  Defendants do not deny that Plaintiff was not provided with several kosher meals upon being confined on keeplock status; rather, in support of summary judgment, Defendants contend that upon being placed on keeplock status for 15 days, beginning with September 30, 2004, Plaintiff, as a special diet inmate, was required by

DOCS regulations to inform Attica's Food Service personnel of the special diet so that appropriate arrangements could be made to provide Plaintiff with the CAD meal in his cell, but that Plaintiff failed to do so.  Defendants' Memorandum at 8-9; Dixon Declaration ¶¶ 17-18, and Dixon Declaration Exhs. I and J.  Because, as Defendants contend, Plaintiff failed to timely notify Attica's Food Service personnel of his kosher diet requirements, Plaintiff was temporarily removed from the CAD program, but Plaintiff only missed a few kosher meals over a five-day program resulting from the administrative error caused by Plaintiff's own lack of communication with Attica's food service personnel which, at most, constitutes negligence, and provides no basis for § 1983 relief.  *Id*.  In fact, in a letter dated October 12, 2004, DOCS Deputy Commissioner John H. Nuttall advised Plaintiff that although Plaintiff's paperwork indicating his religious affiliation had been changed to Jewish from Muslim had been filed, the "automated record system" had not been updated, but had since been corrected and the matter resolved.  Dixon Declaration Exh. J.  Plaintiff submits nothing contradicting Defendants' assertion that Plaintiff's  temporary removal from the CAD program was nothing more than an administrative error based on Plaintiff's failure to timely advise Attica's food service personnel of his brief confinement on keeplock status.

It is settled that mere negligence on the part of prison officials is insufficient to establish liability under § 1983.  *Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986); *Poe v. Leonard*, 282 F.3d 123, 145 (2d Cir. 2002).  The evidence submitted by Defendants in support of summary judgment, including copies of a grievance Plaintiff filed regarding the denial of the CAD meals while in keeplock status, demonstrates no material issue of fact that such denial resulted from Plaintiff's failure to advise Attica's Food Service

personnel of such status, and the fact that such confinement occurred within a short time of Plaintiff's administrative change in his religious designation from Muslim to Jewish.  Dixon Declaration Exhs. I and J.  The evidence also establishes that upon bringing the error to the attention of prison officials, the situation was remedied and Plaintiff received his CAD meal for the balance of his keeplock confinement.  *Id*. Plaintiff offers nothing to rebut this evidence.  As such, the circumstances of the instant case regarding Plaintiff's deprivation of kosher meals while in keeplock are insufficient to support a § 1983 violation under either the First Amendment or RLUIPA.

Insofar as Plaintiff maintains that Defendants "canceled" Plaintiff's "call-out" to pick up trays of kosher food with which Plaintiff was to break the Yom Kippur fast, Complaint ¶ 20, Defendants argue that neither Lt. Dixon, Lopes nor Jabcuga, the only remaining Defendants against whom this claim is asserted, were personally involved in this alleged violation of Plaintiff's religious liberty, as required for § 1983 liability. Defendants' Memorandum at 15-16.  Defendants also reference a memorandum prepared by Sr. Rosalind Rosolowski, Coordinating Chaplain to the Attica Watch Commander, dated September 9, 2004, which provides that Jewish inmates are to be provided with meals proper for Jewish High Holy Days, including Yom Kippur for which the "break-the-fast" CAD meal was to be provided "one hour after sundown, [at] approximately 8:00 pm."  Dixon Declaration Exh. L.[8]  That the subject meal was provided two hours later than the normal dinner hour suggests that Plaintiff may have been confused as to when he should have anticipated being called for the meal, a finding which would negate liability as to Defendants, based on the absence of

---

[8] Plaintiff has not objected to the memorandum as inadmissible hearsay.

causality, but which also would require a factual finding not permitted on summary judgment.  The court, however, need not deny summary judgment as to this claim for a more basic reason.

In particular, Plaintiff does not allege, and points to no evidence suggesting, that he was obligated to eat the specific "break-the-fast" meal for Yom Kippur.  As such, it is not established, for the purpose of avoiding summary judgment, that the denial of the meal "substantially burdened" Plaintiff's sincerely held religious belief in any major tenet of the Jewish faith, *Salahuddin*, 467 F.3d at 274-75; *Ford*, 352 F.3d at 587, and this unintentional deprivation therefore provides no basis for liability as a violation of Plaintiff's rights to religious exercise under the First Amendment or the RLUIPA. Accordingly, summary judgment as to this aspect of Plaintiff's claim is GRANTED.


**3.     Equal Protection**

As for Plaintiff's Fourteenth Amendment equal protection claim, the court observes that Plaintiff essentially alleges Defendants did not permit Jewish inmates receiving the CAD meal to remove kosher food from the mess hall to eat in their cells, while permitting inmates who eat the regular prison diet, presumably non-Jewish inmates, to do so.  Complaint ¶¶ 7, 9, 11-12, 24.  Plaintiff specifically maintains he was not allowed to bring to his cell his packets of instant oatmeal, sanka coffee and tea, as well as whole onions, green peppers and cucumbers, and hermetically sealed packages of meats and cheese, whereas non-Jewish inmates who eat the regular prison diet are permitted to take out of the mess hall all "fruits, hot dogs, hamburgers, cold cuts, cheese, chicken patty and bread."  *Id*. ¶¶ 9-12.  In support of summary judgment,

Defendants attribute Plaintiff's equal protection claim to a misunderstanding created by the renovation of Attica's mess halls just prior to Plaintiff's changing his designated religion to Jewish from Muslim, such that during the renovations, Jewish inmates receiving the CAD diet were required, and permitted, to eat their entire kosher meals in their cells, rather than reporting to an assigned mess hall where the kosher meals are normally provided. Defendants' Memorandum at 6-7; Dixon Declaration ¶¶ 6-9; Dixon Declaration Exhs. C-E. Defendants further maintain that Plaintiff has failed to establish that Defendants' application of Attica's prison policies regarding security and related matters constituted intentional discrimination against Plaintiff based on his Jewish religion. Defendants' Memorandum at 14-15.

"The Equal Protection Clause of the Fourteenth Amendment requires that all persons similarly situated be treated in the same manner." *Allen v. Cuomo*, 100 F.3d 253, 260 (2d Cir. 1996) (citing *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985)). Inmates are not, however, similarly situated to unincarcerated persons, and "[t]he rights of prisoners are necessarily limited because of their incarceration," and "[a] state may treat differently situated people in a different way." *Allen*, 100 F.3d at 260 (citing cases). Establishment of an equal protection violation requires the plaintiff show "purposeful discrimination directed at an identifiable suspect class." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (citing cases). Although discrimination based on religion can establish an equal protection violation, *Benjamin v. Coughlin*, 905 F.2d 571, 574-75 (2d Cir. 1990), inmates are not a suspect class, *Allen*, 100 F.3d at 260 n. 1, and, thus, no higher level of scrutiny is required. *Turner v. Safley*, 482 U.S. 78, 81 (1987) (holding lower level of scrutiny is applied to equal protection challenges to prison

rules and regulations).

Here, in support of summary judgment, Defendants explain that Plaintiff's equal protection claim is properly attributed to Plaintiff's misunderstanding regarding Attica's policy on the CAD program.  Dixon Declaration ¶¶ 6-9; Dixon Declaration Exhs. C-E.  Lt. Dixon explains that upon enrolling in the CAD program on August 9, 2004, Plaintiff received a memorandum from Attica Deputy Superintendent Richard Savage instructing Plaintiff that he could receive his CAD meal by reporting to Mess Hall A and passing through the "Special Diet Line," and also advising that  "[m]eal attendance and strict adherence to the Alternative Diet is mandatory and will be closely monitored," and that three unexcused absences within one week's time would result in Plaintiff's suspension from participating in the program.  Dixon Declaration ¶ 6; Dixon Declaration Exh. C.  Lt. Dixon further explains that between April 6 and July 16, 2004, Attica's three mess halls "underwent reconstruction, followed by a cleanup period," and during this time, one mess hall would be closed for reconstruction, leaving the other two open for service. Dixon Declaration ¶ 8.  According to Dixon, with the temporary closure of one mess hall, there was not sufficient room to accommodate the entire prison population, so the decision was made to feed the special diet inmates, including the CAD inmates like Plaintiff, in their cells throughout the reconstruction period while the rest of the general prison population, including the non-Jewish inmates, ate in the two open mess halls.  *Id*. Upon completion of the reconstruction, the special diet inmates, including the CAD inmates like Plaintiff, were fed in Mess Hall B, according to the same prison regulations applicable to the general prison population inmates who eat the regular prison diet.  *Id*. ¶¶ 8-9 and Exh. E (August 24, 2004 Memorandum from Lopes advising Plaintiff that as

26

of August 26, 2004, Plaintiff was to report to Mess Hall B to receive his CAD meal).

Significantly, Plaintiff submits nothing in support of his allegation that inmates within the general prison population who eat the regular prison diet (and who presumably are non-Jewish), are routinely permitted to take food items from the mess halls to their cells and that inmates receiving the CAD are not.  Rather, according to the "Inmate Orientation Guideline Manual, Section IV - Food Services, Messhall [*sic*] Policy and Procedures Part 8.3" ("Food Service Policy"), Dixon Declaration Exh. F, all meals are to be provided "cafeteria style with limits placed on certain items."  Inmates are required to eat all food items selected, and although certain rationed items are permitted to be carried from the mess hall, all other food must be consumed or discarded in the mess hall.  Food Service Policy Part 8.3   A maximum of four rationed items are permitted to be taken out of the mess hall, including bakery items, bread, desserts, fresh fruit, meat without sauce and sugar. *Id*.  Certain foods, however, may not be removed, including bulk or scooped food, liquids (such as coffee, juice, and milk), corn on the cob, and vegetables.  *Id*.

A plain reading of the Complaint reveals that none of the food items Plaintiff was prohibited from removing from the mess hall, including the instant oatmeal, sanka coffee and tea packets, and the whole onions, peppers and cucumbers, were among the list of rationed items permitted to be removed from the mess hall.  Insofar as Plaintiff maintains that the peppers and cucumbers are fruits, rather than vegetables, Complaint ¶ 13, Plaintiff does not allege that any non-Jewish inmate was permitted to remove such food items from the mess hall as required to establish an Equal Protection violation.  As for the CAD meal meat items Plaintiff maintains he was not allowed to remove,

27

evidence in the record establishes that Plaintiff was permitted to remove such items once they had been opened, including the hermetically sealed meats and cheeses, and the cans of tuna fish and sardines, and that the requirement that such items be opened prior to eating was a matter of legitimate prison security concerns.  *See* Dixon Declaration ¶¶ 15-16; Dixon Declaration Exhs. M and N.  Furthermore, all the items Plaintiff maintains the non-Jewish inmates who received the regular prison diet were permitted to remove from the mess hall, including  "fruits, hot dogs, hamburgers, cold cuts, cheese, chicken patty and bread," Complaint ¶ 12, are included on the list of rationed items permitted to be removed from the mess hall by any inmate, including Plaintiff if he chose to do so.  Food Service Policy Part 8.3.  Significantly, Plaintiff does not claim that any other general population non-Jewish inmate was allowed to remove hermetically sealed packages of meat and cheese, or unopened cans of tuna fish and sardines or any other canned foods.

According to Lt. Dixon, in August 2004, around the time that the Jewish inmates began to again receive their CAD meals from the mess hall, rather than having the meals served to them in their cells because of the diminished mess hall seating capacity attributed to the renovation of the mess halls, "CAD inmates were attempting to leave Mess Hall B with their CAD trays still wrapped."   Dixon Declaration ¶ 15.  Lt. Dixon advised CAD inmates, including Plaintiff, that such conduct was not allowed because of security concerns, but that once the trays were opened in the mess halls, the inmates were permitted to take the same items from the trays to their cells, *i.e.*, the rationed items, as were the non-Jewish and general prison population receiving the regular prison diet.  Dixon Declaration ¶ 15.  Plaintiff does not contradict Dixon's Declaration in

this regard.  Absent some evidence that the Food Service Policy was applied to CAD

inmates in a manner different from the way it was applied to non-CAD inmates, there is

no basis for Plaintiff's equal protection claim.

On this record, Plaintiff's equal protection claim fails, and summary judgment is

GRANTED.

**4.      Excessive Force**

Plaintiff alleges that Defendants Dixon, Petties and Markowski repeatedly

threatened and harassed Plaintiff in an attempt to coerce Plaintiff to discontinue

pursuing his grievances, and that when Plaintiff failed to do so, Defendant Petties

assaulted Plaintiff.  Complaint ¶¶ 33-35.  According to Plaintiff, Defendant Markowski

ordered Petties to assault Plaintiff, and after the assault, Markowski "informed Plaintiff

'that was just a warning, so you better drop your grievances . . . or the next time you

won't be so lucky,'" and that "'accidents happen,'" advising Plaintiff "'to be smart and

drop his grievances . . . and save himself [Plaintiff] a lot of trouble, or he might end up in

the hospital, if he don't [*sic*].'"  Complaint ¶¶ 36-37.  Defendants argue in support of

summary judgment of Plaintiff's Eighth Amendment excessive force claim alleged

against Defendants Dixon, Petties and Markowski, that Plaintiff has failed to exhaust

administrative remedies relative to such claim, Defendants' Memorandum at 18, that no

objective evidence substantiates Plaintiff's claim, *id.* at 19-21, and that the alleged use

of force was, at most, *de minimus*, which is not actionable under the Eighth

Amendment.  *Id*. at 22-23.  These arguments are, however, insufficient to support

summary judgment.

### A.   Failure to Exhaust Administrative Remedies

Defendants contend that Plaintiff's failure to exhaust available administrative remedies as to his Eighth Amendment excessive force claim requires summary judgment on such claim.  Defendants' Memorandum at 18.  In opposition, Plaintiff argues that he prepared and filed a grievance relative to the excessive force claim, but that Attica's "prison authorities" never forwarded the grievance to DOCS Central Office Review Committee ("the CORC").  Plaintiff's Memorandum at 21; Plaintiff's Declaration ¶ 14; Plaintiff's Statement of Facts ¶ 14.  In support of his contention, Plaintiff does not attach copies of the putative grievances but, rather, references a hand-written list of the inmate grievances he allegedly filed, including the two Plaintiff maintains pertained to the assault, *i.e.*, Inmate Grievances "47651-04 - Threats" and "47825-04 - Threats." Plaintiff's Memorandum at 21; Plaintiff's Declaration ¶ 14; Plaintiff's Statement of Facts ¶ 14 (all referencing Plaintiff's Exh. I).  Significantly, in further support of summary judgment, Defendants assert that the fact that the disputed grievance were assigned grievance numbers negates Plaintiff's assertion that the grievances were never filed and processed.  Murphy Reply Declaration ¶ 15.

Under the PLRA, exhaustion of all available administrative remedies is required before a § 1983 civil rights action challenging prison conditions, including excessive force claims, may be commenced.  28 U.S.C. § 1997e; *Macias v. Zenk*, 495 F.3d 37, 40 (2d Cir. 2007) ("'the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.'" (quoting *Porter v. Nussle*, 534 U.S. 516, 532 (2002)).  In New York, DOCS provides a three-step review process

which an inmate must exhaust prior to commencing a § 1983 action.  *Reyes v. Punzal*, 206 F.Supp.2d 431, 432 (W.D.N.Y. 20002).

Specifically, the grievance must first be submitted to the prison's Inmate Grievance Review Committee ("the IGRC"), comprised of both inmates and DOCS employees.  *Reyes*, 206 F.Supp.2d at 432.  If the IGRC's decision is unfavorable to the inmate, the inmate may appeal the decision to the superintendent of the relevant correctional facility.  *Id*.  The superintendent's decision is further appealable to the CORC which makes the final administrative decision.  *Id*.  Significantly, all three levels of administrative review must be exhausted before an inmate may seek § 1983 relief in federal court.  *Id*. (citing cases).

Exhaustion of administrative remedies is, however, an affirmative defense, rather than a jurisdictional requirement.  *Jones v. Bock*, __ U.S. __, 127 S.Ct. 910, 919-20 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004); *Giano v. Goord*, 380 F.3d 670, 677 (2d Cir. 2004).  As such, if not raised as an affirmative defense, the defendants waive the failure to exhaust.  *Johnson*, 380 F.3d at 695.  Furthermore, as with any affirmative defense, the burden is on the defendants to establish that the plaintiff failed to exhaust.  *Giano*, 380 F.3d at 675.  Accordingly, in the instant case, it is Defendants' burden to establish that Plaintiff failed to exhaust administrative remedies relative to the Eighth Amendment excessive force claim.

Although exhaustion generally is mandatory, in certain situations, including where administrative remedies are not "'available' to prisoners seeking redress of their grievances," the plaintiff's failure to exhaust is justified.  *Giano*, 380 F.3d at 675 (citing 42 U.S.C. § 1997e(a)).  Thus, to meet their burden on the affirmative failure to exhaust

defense, Defendants must first establish that administrative remedies were available, but that Plaintiff failed to exhaust them.  Significantly, the parties do not dispute that DOCS provides a formal procedure by which an inmate may seek administrative relief for grievances arising at DOCS's facilities and applicable to Plaintiff as of October 15, 2004, when Plaintiff alleges he was assaulted.  Rather, Defendants, inconsistently, maintain that Plaintiff "never filed a grievance regarding this alleged assault, and he makes no allegation to the contrary in the complaint," Defendants' Memorandum at 18, but later assert, inconsistently, that although Plaintiff contends Attica prison officials prevented him from filing any grievance regarding the alleged assault, that Plaintiff's handwritten list of the inmate grievances, Plaintiff's Exh. I, includes two grievances pertaining to the alleged assault which were assigned inmate grievance numbers establishes that such grievances were, in fact, filed.  Murphy Reply Declaration ¶ 15.

The court need not, however, attempt to resolve this apparent discrepancy as such general assertions regarding Plaintiff's failure to exhaust administrative remedies is, without more, insufficient to satisfy Defendants' burden of proof on this affirmative defense.  *See Black v. Coughlin*, 76 F.3d 72, 75 (2d Cir. 1996) (holding it is defendant's burden in a § 1983 action to prove, either at trial or on summary judgment, affirmative defense asserted by defendants, and plaintiff was not required to establish absence of such defense).  Significantly, Defendants admit that "DOCS maintains records of grievances filed by inmates," Murphy Reply Declaration ¶ 15, yet have not submitted anything substantiating their contention that Plaintiff did not exhaust his administrative remedies as to the alleged assault, such as a log showing the absence of any such claim having been filed during the relevant period of time, an affidavit from Attica's

32

Inmate Grievance Program ("IGP") indicating that no such claim had ever been filed, or, more significantly, that Inmate Grievance Nos. 47651-04 and 47825-04 were assigned to other claims unrelated to the alleged October 15, 2001 assault on Plaintiff or have never been assigned to any grievance.  Nor do Defendants submit anything indicating that Plaintiff's claim was filed with the IGRC, and denied, and that Plaintiff failed to appeal the denial, despite, as indicated, admitting, Murphy Reply Declaration ¶ 15, that the assignment of an inmate grievance number to the disputed grievances is evidence that the grievances were, in fact, filed.  *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 278 (2d Cir. 2003) (observing that absent statutory language to the contrary, Second Circuit would not hold that Congress intended plaintiff to carry the burden of establishing a negative proposition where such would impose an "enormous evidentiary burden," and citing cases, including *Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th Cir. 2003) (concluding Congress intended PLRA's administrative exhaustion requirement as an affirmative defense because, *inter alia*, prison official defendants have better access to prison records).

Accordingly, summary judgment on Plaintiff's Eighth Amendment excessive force claim based on failure to exhaust administrative remedies is DENIED.

## B.      Merits of Excessive Force Claim

Having denied summary judgment on Plaintiff's Eighth Amendment excessive force claim based on failure to exhaust, the court considers the merits of the claim. Plaintiff claims that Defendant Petties, acting on Markowski's direction, assaulted him on October 15, 2004, causing Plaintiff physical injuries, including blurry vision, ringing in

the ears, migraine headaches and dizziness.  Complaint ¶¶ 32 and 40.  Defendants

argue in support of summary judgment on this claim that no objective evidence in the

record supports this claim, Defendants' Memorandum at 19-21, and, in any event, there

is no evidence that any force Defendant Petties used against Plaintiff on October 15,

2004 was more than *de minimus*, which is not actionable under § 1983.  *Id*. at 22-23.

    In assessing an inmate's claims that prison officials subjected him to cruel and

unusual punishment by using excessive force, courts must determine whether the

prison officials acted "in a good-faith effort to maintain or restore prison discipline, or

maliciously and sadistically to cause harm."  *Hudson v. McMillian*, 503 U.S. 1, 7 (1992).

An inmate plaintiff claiming that prison officials subjected him to cruel and unusual

punishment by use of excessive force must establish both an objective and subjective

component of the claim.  *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993).

    Objectively, a § 1983 plaintiff must establish that the alleged deprivation is

sufficiently serious or harmful to reach constitutional dimensions.  *Romano*, 998 F.2d at

104; *see Wilson*, 501 U.S. at 296.  This objective component is "contextual and

responsive to 'contemporary standards of decency.'" *Hudson*, 503 U.S. at 9.  Thus,

while a *de minimis* use of force will rarely suffice to state a constitutional claim, a plaintiff

is not required to show that the application of force resulted in any serious injury.  *Id*. at

9-10.  The subjective component of an Eighth Amendment excessive force claim is

whether the force was applied in a good-faith effort to maintain or restore discipline, or

maliciously and sadistically to cause harm, and the use of any unnecessary force is

always considered excessive.  *Whitley v. Albers*, 475 U.S. 312, 322 (1986) (use of force

is always unreasonable where action was "taken in bad faith or for no legitimate

34

purpose").  In fact, "the malicious use of force to cause harm constitutes an 'Eighth Amendment violation[ ] *per se* . . . whether or not significant injury is evident.'"  *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999) (quoting *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)) (brackets and ellipses in original).

Nor does an Eighth Amendment excessive force claim require any serious injury.  *Whitley*, 475 U.S. at 322.  Rather, a prison official's malicious and sadistic use of force to cause harm always violates contemporary standards of decency, regardless of whether any significant injury is evident.  *Hudson*, 503 U.S. at 9 (citing Whitley, 475 U.S. 312, 327 (1986)).  "Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury," a result as unacceptable to the drafters of the Eighth Amendment as it is today.  *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 102 (1976), and *Wilkerson v. Utah*, 99 U.S. 130, 136 (1879)).

In evaluating Defendants' contentions directed to Plaintiff's excessive force claim, the court finds *Griffin*, *supra*, to be apposite.  At issue in *Griffin*, was whether the District Court erred in dismissing the plaintiff inmate's § 1983 excessive force claim given that the claim was "weak" and the supporting evidence was "extremely thin."  *Griffin*, 193 F.3d at 91-92.  In particular, the inmate plaintiff claimed he was subjected to excessive force by two prison guards who assaulted him and then faked and inflicted injuries onto themselves to cover up the misconduct.  *Id.* at 90.  In that case, the inmate also had pleaded guilty in state court to criminal charges brought in connection with the incident.  *Id.* at 90-91.  Further, the only evidence offered in support of the claim was plaintiff's own testimony and minimal injuries of a bruised shin and some swelling over a knee.

35

*Id*. at 91.  Nevertheless, in reversing, the Second Circuit held that the "weakness" of the claim and "extremely thin" evidence, *i.e.*, the plaintiff's averments and minimal injury, did not preclude a reasonable jury from finding that excessive force was used against the plaintiff.  *Id*. at 92.

Here, in support of summary judgment, Defendants maintain that no objective evidence in the record supports Plaintiff's claim that he was assaulted on October 15, 2004 and, as such, any force Defendant Petties used against Plaintiff on that day was, at most, *de minimus*, which is not actionable under § 1983.  Defendants' Memorandum at 19-23.  In opposing summary judgment on Plaintiff's claim that he sustained physical injuries as a result of the assault, including blurred vision, ringing in the ears, migraine headaches, dizziness, and pain, Complaint ¶ 40, Plaintiff maintains that Defendants have failed to refute the allegation that Petties, acting at Markowski's direction, ordered Plaintiff to the commissary so as to assault Plaintiff, and that Plaintiff's personal log of inmate grievances filed demonstrates he filed an inmate grievance regarding the assault.  Plaintiff's Memorandum at 24-25; Plaintiff's Declaration ¶ 12; Plaintiff's Exh. I.  Significantly, these averments are corroborated by a statement made by Attica Registered Nurse Vance Hawley ("Hawley").  Specifically, Hawley states that "[a]s the Attica nurse on duty on October 18, 2004, I performed plaintiff's medical examinations because he complained of an assault by an unnamed individual.  The medical records of the examination indicate that plaintiff had subjective, unsupported complaints of ringing in the ears and blurred vision."  Hawley Declaration ¶ 3.  Although Plaintiff "exhibited no bruising, swelling, redness or other signs of any assault," Hawley provided

Plaintiff with over-the-counter pain medication.  *Id.*[9]  Plaintiff's medical records, as related by Vance, thus corroborate Plaintiff's claim that he was assaulted on October 15, 2004 and creates a genuine issue of material fact as to whether Plaintiff was assaulted.  *See Griffin*, 193 F.3d at 91-92.

Nor is the fact that Plaintiff's medical records provide no direct evidence that Plaintiff was injured on February 28, 2004 dispositive of the claim.  Rather, an Eighth Amendment excessive force claim does not require any serious injury.  *Hudson*, 503 U.S. at 8; *Johnson*, 481 F.2d at 1028.  Furthermore, the record on this motion establishes that Plaintiff complained of injuries on Monday, October 18, 2004, three days after the alleged assault on Friday, October 15, 2004, thereby presenting a reasonable basis to support an inference that the passage of time between the alleged assault and Vance's examination was sufficient for Plaintiff's injuries to heal enough as to not be readily apparent to Hawley.

Further, the statements submitted by Petties and Markowski do not preclude the possibility that Plaintiff may have been assaulted on October 15, 2004.  Specifically, although Petties maintain that Plaintiff "incorrectly alleges that I assaulted him on October 15, 2004," Petties Declaration ¶ 3, Petties, without directly denying Plaintiff's allegation, only supports this assertion by pointing to the absence of any documentary evidence to the contrary.  For example, Petties represents that he was not aware that Plaintiff had filed Grievances 47427-04 and 47428-04 until Petties read the Complaint.  *Id*. ¶ 4.  Petties also points to the absence of any "use of force report" which Petties

---

[9] While Hawley further avers that "[a] true and correct copy of plaintiff's ambulatory health record is attached hereto as Exhibit A," Hawley Declaration ¶ 3, no such exhibit is attached, nor is any copy of Plaintiff's ambulatory health record found elsewhere in the record.

would have been required to complete had he used force against Plaintiff, and that the completion of such report "would have prompted an investigation which never occurred." *Id*. ¶ 5.  Petties further asserts that Plaintiff, incorrectly, *see* Discussion, *supra*, at 31-32, never filed any grievance regarding the alleged assault, which would have been investigated, *id.*, and that Petties was never disciplined in connection with any assault.  *Id*. ¶ 6.  Petties summarizes that the absence of any documentary evidence or investigation into the alleged assault "demonstrate[s] that no assault ever took place." *Id*.

Similarly, Defendant Markowski states that he "never observed any use of force by C.O. Petties on plaintiff," Markowski Declaration ¶ 4, and that Plaintiff never filed any grievance regarding the alleged assault, which would have prompted a thorough investigation into the matter.  *Id*. ¶ 5.  Markowski continues that he was not aware Plaintiff had filed Grievances 47427-04 and 47428-04 until he read Plaintiff's complaint. *Id*. ¶ 6.

The Petties and Markowski Declarations, however, fail to demonstrate the absence of any genuine issue of material fact as to whether Plaintiff was assaulted. Rather, accepting Petties's statement implying that he did not assault Plaintiff, and Markowski's statement that he did not "observe" Petties assault Plaintiff over Plaintiff's unambiguous statement that he was assaulted by Petties, acting at Markowski's direction, would require the court to weigh evidence, which is not allowed on summary judgment. *Kessler v. Westchester County Dept. of Social Services*, 461 F.3d 199, 206 (2d Cir. 2006) ("'[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there

is a genuine issue for trial.'" (quoting *Anderson*, 477 U.S. at 249)); *see Griffin*, 183 F.3d at 91-92 (court's consideration of evidence in support of plaintiff inmate's claim as "thin" was improper basis for dismissal of claim).   Furthermore, Defendants' assertion that Plaintiff never filed any grievance regarding the alleged assault begs the question given that, as Defendants concede, Murphy Reply Declaration ¶ 15, Plaintiff has submitted evidence, Plaintiff's Exh. I, that a grievance pertaining to the alleged assault was both filed and assigned an inmate grievance number.  *See* Discussion, *supra*, at 31-32. Simply, Petties's failure to directly deny Plaintiff's claim that he assaulted Plaintiff, while insisting that Plaintiff "incorrectly" maintains he was assaulted, and Markowski's failure to deny that he directed Petties to assault Plaintiff, and statement that he never observed such an assault attempts to 'slice the cheese' a bit too finely.  Indeed, a reasonable jury could find the statements of Petties and Markowski to be evasive. As such, there is a material issue of fact as to the first prong of Plaintiff's excessive force claim, and the court next considers the second, subjective prong of the claim.

The subjective component of an Eighth Amendment excessive force claim requires that the defendants act maliciously and with the intent to harm the inmate plaintiff.  *Hudson*, 503 U.S. at 7; *Romano*, 998 F.2d at 105.  To determine whether the defendants acted maliciously, the trier of fact should consider (1) the extent of the plaintiff's injuries; (2) the need for the application of force; (3) the correlation between the need for force and the amount of force used; (4) the threat reasonably perceived by the defendants; and (5) any efforts made by the defendants to temper the severity of a forceful response.  *Whitley*, 475 U.S. at 321.  In evaluating a prisoner's Eighth Amendment excessive force claim, even *de minimis* force is taken in bad faith if used for

no legitimate purpose.  *Id*. at 322.   Here, with regard to the first *Whitley* factor, it is

undisputed that any injuries Plaintiff sustained as a result of the alleged October 15,

2004 use of force were *de minimus*.   Nevertheless, as with the objective prong, whether

Plaintiff was subjected to the use of any unnecessary force is a critical disputed fact.

This unresolved factual issue as to the objective prong of Plaintiff's excessive force

claim is not only material, but also sufficient to preclude summary judgment as it also

precludes the court from making any determination as to the second, third, fourth and

fifth *Whitley* factors necessary to establish the claim's subjective element.

Nothing in the record, however, indicates any personal involvement by Defendant

Dixon in the alleged assault.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (to

establish liability under § 1983, plaintiff must show defendant was personally involved in

the alleged constitutional violation).  As such, summary judgment on Plaintiff's

excessive force claim is GRANTED as to Dixon.

Here, because the record establishes a genuine issue of material fact as to

whether Plaintiff was subjected to any force on October 15, 2004, the court is unable to

reach the issue as to whether such force was reasonable, a question that must

therefore await trial.  As such, summary judgment as to Plaintiff's excessive force claim

is DENIED as to Defendants Petties and Markowski, but GRANTED as to Defendant

Dixon.

### 5.  Retaliation

Plaintiff alleges that after filing Grievances 47427/04 and 47428/04 on

September 1, 2004, complaining about the manner in which the CAD meals were

provided, Defendants retaliated against him by placing Plaintiff in keeplock confinement

from September 30, through October 15, 2004, threatening Plaintiff with physical harm if

Plaintiff did not withdraw the grievances, flooding Plaintiff's cell on October 15, 2004,

and that Petties assaulted Plaintiff on October 15, 2004.  Complaint ¶¶ 8, 27, 31-37.

Defendants argue in support of summary judgment that Plaintiff is unable to establish

that Defendants took any adverse action against Plaintiff, or that any adverse action

taken against Plaintiff was causally connected to Plaintiff's participation in any protected

activity, in this case, his grievance filings.  Defendants' Memorandum at 23-27.

　　　For a plaintiff to succeed in a First Amendment retaliation claim, he must show

that 1) the conduct cited as the cause for retaliation is protected; 2) the defendant took

adverse action against the plaintiff; and 3) there was a causal connection between the

protected conduct and the adverse action.  *Davis v. Goord*, 320 F.3d 346, 352 (2d

Cir.2003).  Courts are properly skeptical of prisoner retaliation claims as "virtually any

adverse action taken against a prisoner by a prison official - even those otherwise not

rising to the level of a constitutional violation - can be characterized as a constitutionally

proscribed retaliatory act." "  *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001),

*overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).    "Only

retaliatory conduct that would deter a similarly situated individual of ordinary firmness

from exercising his or her constitutional rights constitutes an adverse action for a claim

of retaliation."  *Davis*, 320 F.3d at 353 (internal quotation marks and citation omitted).  In

making this determination, courts are to "bear in mind" that "prisoners may be required

to tolerate more than average citizens, before a retaliatory action taken against them is

considered adverse."  *Dawes*, 239 F.3d at 493 (internal quotation marks and citations

omitted).

The filing of prisoner grievances is among the conduct protected by the First Amendment and thus actionable under § 1983.  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.1995).  *See Smith v. Woods*, 2006 WL 1133247, at * 10 (N.D.N.Y. Apr. 24, 2006) (extending First Amendment protection to making of oral complaints to correctional officers), *aff'd*, 219 Fed. Appx. 110 (2d Cir. 2007).  As such, Plaintiff's allegations that he was subjected to retaliatory conduct for filing Grievances 47427-04 and 47428-04 satisfies the first element of the retaliation claim.

With regard to the second element requiring adverse action, Plaintiff's alleges that Defendants threatened and harassed him to drop the grievances, flooded Plaintiff's cell with water, placed him in keeplock confinement, and that Petties, at Markowski's direction, assaulted him.  Complaint ¶¶ 8, 27, 31-37; Plaintiff's Memorandum at 24-26; Plaintiff's Declaration ¶¶ 12-13.  Insofar as Plaintiff maintains that Defendant Petties and Markowski threatened and assaulted Plaintiff and Defendants flooded Plaintiff's cell, such assertions satisfy the second element of a retaliation claim.  *See Davis*, 320 F.3d at 352 (the use of unnecessary force to retaliate against a plaintiff for engaging in protected activity constitutes unlawful retaliation); *Gill v. Pidlypchak*, .389 F.3d 379, 384 (2d Cir. 2004) (allegations that corrections officers made threats against inmate for filing prison grievance along with allegation that corrections officers followed through with such threats constitutes adverse action for § 1983 retaliation claim); *Woods v. Medlock*, 2008 WL 123845, * 6 (W.D.Pa. Jan. 9, 2008) (denying motion to dismiss inmate's § 1983 retaliation claim alleging defendant correctional officers placed inmate plaintiff in

unlighted, flooded, filthy cell to retaliate against plaintiff's filing lawsuits).[10]

Nevertheless, although "[a]n allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a prison grievance, states a claim under § 1983," *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (citing *Franco v. Kelly*, 854 F.2d 584, 589-90 (2d Cir. 1988)), Plaintiff's allegation that he was placed in keeplock confinement on September 30, 2004, in retaliation for filing the grievances, however, is without merit.

Essentially, such an allegation calls into question the validity of the prison violation with which Plaintiff was charged, resulting in the keeplock confinement. Plaintiff, however, has not challenged the veracity of such charges. *See Jones v. Coughlin*, 34 F.3d 677 at 679 (2d Cir. 1995) (vacating and remanding district court's decision that inmate plaintiff's claim of retaliatory filing of false misbehavior report was wholly conclusory as based solely on adverse disciplinary decision where plaintiff, although provided a hearing on the disputed disciplinary charges, "was unfairly denied the right to call key witnesses in defense of the charges against him," and, thus, had no opportunity to prove charges were false, as required before the district court could consider whether filing of false charges was intended to retaliate against the plaintiff).

---

[10] Defendants' assertion, Dixon Declaration ¶ 27, and October 16, 2004 Memorandum from DOCS Lt. J. Lambert to Sgt. K. Barbary, Dixon Declaration Exh. P, explaining that no "logical explanation why water was coming through the cell vent of Odom's cell" on October 15, 2004, and that such flooding has not reoccurred does not, as Defendants insist, Defendants' Memorandum at 25 n. 5, establish that no Defendant was responsible for the flooding of Plaintiff's cell or that such flooding was unintentional. Rather, the unexplained cause of the undisputed, but suspicious, flooding can be interpreted as establishing the flooding was the result of a purposeful act. Significantly, Defendants, who possess the exclusive capability to do so, fail to explain what steps were taken to objectively investigate the issue, or any other efforts to establish the actual cause of the flooding. Surely, a competent plumber could provide a reasonable explanation. Indeed, DOCS's failure to determine the cause could be circumstantial evidence of a conscious avoidance of knowledge of Defendants' involvement.

Further, the filing of a false misbehavior report does not constitute "a *per se* constitutional violation actionable under § 1983" provided the inmate is afforded due process protection through a disciplinary hearing on the misbehavior report.  *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986) ("prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest"), *cert. denied*, 485 U.S. 982 (1988). "The key inquiry in assessing an allegation that an inmate has been found guilty of false disciplinary charges is whether or not the prison has provided the inmate with the minimum procedural due process protections [to dispute a false or incorrect charge] guaranteed by the Fourteenth Amendment."  *Franco v. Kelly*, 854 F.2d 584, 587 (2d Cir. 1988) (bracketed material added).  Summary judgment on a retaliation claim based on the filing of a false misbehavior report, however, is improper where an inmate either is not granted a hearing on the alleged false disciplinary charges, or is granted a disciplinary hearing, but is unfairly denied the right to rebut the charges by presenting evidence or calling witnesses in defense of the charges against him.  *Jones*, 45 F.3d at 679.  Here, Plaintiff does not allege that no disciplinary hearing on the charges was ever held, or that Plaintiff was denied due process in connection with such hearing.  As such, Plaintiff cannot establish the second element of a retaliation claim based on his keeplock confinement and summary judgment is GRANTED as to this aspect of Plaintiff's retaliation claim.

Finally, with regard to the third element requiring a causal connection between Plaintiff's participation in the protected activity, *i.e.*, the filing of grievances, and the adverse action, the Second Circuit has held that the temporal proximity of an adverse

action in relation to the filing of an inmate grievance is circumstantial evidence of a causal connection so as to establish a retaliation claim. *Colon*, 58 F.3d 872.  Here, because the alleged threats, assault, and unexplained flooding of Plaintiff's cell occurred within a short time after Plaintiff filed the grievances on September 1, 2004, a material fact issue regarding the causal connection is established as to this aspect of the claim.

As Plaintiff has demonstrated a material issue of fact necessary to establish that Defendants took adverse action against Plaintiff based on Plaintiff's grievances, *i.e.*, flooding Plaintiff's cell and threatening and assaulting Plaintiff, summary judgment on this portion of Plaintiff's retaliation claim is DENIED.


### 6.    Qualified Immunity

Alternatively, Defendants argue they are qualifiedly immune from liability in the instant action.  Defendant's Memorandum at 27-30.  Because summary judgment is GRANTED in favor of Defendants on the Plaintiff's First Amendment and RLUIPA religious freedom claims and the Fourteenth Amendment Equal Protection claim, qualified immunity is considered only with regard to Plaintiff's Eighth Amendment excessive force and First Amendment retaliation claims.   Plaintiff argues in opposition that Defendants are not qualifiedly immune from liability in the instant case because it was not objectively reasonable for Defendants to believe the actions of which Plaintiff accuses them did not violate Plaintiff's civil rights as alleged in his Second Cause of Action.  Plaintiff's Response at 32-40.

The doctrine of qualified immunity "shields a government official acting in an official capacity from suit for damages under § 1983 unless the official 'violated clearly

45

established rights of which an objectively reasonable official would have known.'"

*Blouin v. Spitzer*, 356 F.3d 348, 359 (2d Cir. 2004) (quoting *Kinzer v. Jackson*, 316 F.3d

139, 143 (2d Cir. 2003)).   "The determination generally involves a two-step inquiry: do

the facts alleged show the officer's conduct violated a constitutional right, and, if so, was

the right in question clearly established?"  *Blouin*, 356 F.3d at 359 (citing *Saucier v.*

*Katz*, 533 U.S. 194, 201 (2001) (qualified immunity does not shield government official

from liability in civil rights action where alleged facts, taken in light most favorable to

party asserting injury, show defendant government official's conduct violated a

constitutional right that was clearly established at the time of the alleged violation)).

Here, the record before the court fails to establish that qualified immunity shields

Defendants from the instant litigation with regard to the Eighth Amendment excessive

force claim and the retaliation claim based on threats, abuse and flooding.

In particular, at the time of the alleged constitutional violations, excessive use of

force against inmates for any purpose regarding prison administration was well

established.  *See Hudson*, 503 U.S. at 7-8.  Plaintiff's right to file an inmate grievance,

including verbal complaints to prison supervisors, without fear of retaliation was equally

well established at the time of the alleged events in this case.  *Davis*, 320 F.3d at 352-

53 (filing of prison grievances is activity protected by the First Amendment).  Moreover,

on this record, the court finds that if the facts pertaining to Plaintiff's excessive force

claim as alleged by Plaintiff are established at trial, no reasonable corrections officer

could reasonably believe he was not violating Plaintiff's constitutional rights.  *Saucier*,

533 U.S. at 201.

As such, Defendants' summary judgment motion, insofar as it alternatively

asserts the defense of qualified immunity, is DISMISSED as moot in regard to Plaintiff's

religious freedom and equal protection claims, and the excessive force claim as alleged

against Dixon, and is DENIED as to the excessive force claim against Defendants

Petties and Markowski and the retaliation claim.


## **CONCLUSION**

Based on the foregoing, Defendants' motion for summary judgment (Doc. No. 47)

is GRANTED in part and DENIED in part.

The parties are to appear before the undersigned on April 2, 2008 at 11:00 A.M. to

schedule further proceedings.  The Attorney General's Office shall make arrangements

for Plaintiff to appear by telephone.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      February 15, 2008
            Buffalo, New York

**Any appeal of this Decision and Order must be taken to by filing a
notice of appeal within 30 days of the filing of this Decision and
Order pursuant to Fed. R. App. P. 4(a)(1) & (c).**